SULLIVAN *v.* STATE.

Opinion delivered February 25, 1924.

1. JURY—NO RIGHT TO SERVICES OF PARTICULAR JUROR.—Accused has no right to the services of a particular juror, but only to a trial before a fair and impartial jury, and the fact that several jurors were excused, and that their places were taken by jurors from a special venire, was not ground for objection.

2. JURY—DISCRETION TO SUMMON SPECIAL VENIREMEN.—The trial court has wide discretion in summoning special veniremen to avoid unnecessary delay and expense, and the fact that special jurors were summoned before the trial began was not error.

3. HOMICIDE—EVIDENCE OF PREVIOUS CRIMES.—In a prosecution for murder of police officers, where the State's theory was that accused and his companion were professional criminals who, because of their crimes, were apprehensive of arrest, evidence that they had committed burglaries and that accused's companion had killed a man in another State was admissible to show motive in killing the officers.

4. HOMICIDE — INCOMPETENT EVIDENCE — HARMLESS ERROR.— In a prosecution for murder, an instruction that evidence that a codefendant had previously killed a man could not be considered against defendant removed any prejudice to defendant in admitting the testimony and in refusing to suspend the trial to enable codefendant to obtain testimony to support an alibi as to such previous homicide.

5. HOMICIDE—ADMISSIBILITY OF DYING DECLARATIONS.—Where evidence as to whether statements by a deceased police officer were made under consciousness of impending death was conflicting, the question was properly submitted to the jury.

6. CRIMINAL LAW—EVIDENCE AS TO LOCATION OF WOUNDS.—Where two police officers were killed at the same time, testimony by a surgeon who performed an autopsy on the body of one them

was properly admitted in a prosecution for the murder of the other officer, to prove the location of the wounds.

7. CRIMINAL LAW—INSTRUCTION AS TO COMMISSION OF OTHER CRIMES.—In a prosecution for the murder of two police officers based upon the theory that accused and his codefendant were professional criminals who, because of such fact, were apprehensive of arrest, an instruction that defendant's commission of other crimes should not be considered was properly refused.

8. CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—A refusal to instruct on matters fully covered in other instructions was not error.

9. CRIMINAL LAW—BURDEN OF PROOF.—The State is not required to prove each circumstance tending to show guilt beyond a reasonable doubt; it being sufficient if, upon a consideration of the testimony as a whole, it is sufficient to convince, and does convince, the jury beyond a reasonable doubt of the guilt of the accused.

10. HOMICIDE—INSTRUCTION.—Refusal to charge that, if appellant did not do any of the shooting, or if the jury had reasonable doubt thereof, they must find him not guilty of the homicide, was not error, for, though he did not fire a shot, he was liable if he stood by and aided or abetted his codefendant in doing so.

11. HOMICIDE—INSTRUCTION.—An instruction that, before defendants could be convicted of murder in the first degree, the proof must be sufficient to satisfy the jury beyond a reasonable doubt that the death of the police officer was the ultimate result sought by the concurring will, deliberation, malice and premeditation of the defendants or either of them, *held* correct; the use of the word "must" for "shall" being merely matter of emphasis.

12. CRIMINAL LAW—INSTRUCTION SINGLING OUT TESTIMONY.—It is not the province of the court to emphasize the value or relative bearing of any testimony, but this is the peculiar province of the jury.

13. HOMICIDE—SUFFICIENCY OF EVIDENCE.—In a prosecution for murder in first degree, evidence *held* to sustain a conviction.

Appeal from Pulaski Circuit Court, First Division; *John W. Wade,* Judge; affirmed.

*T. M. Mehaffy, M. E. Dunaway* and *E. L. McHaney,* for appellant.

*J. S. Utley,* Attorney General, *John L. Carter, Wm. T. Hammock, Darden Moose* and *J. S. Abercrombie,* Assistants, for appellee.

SMITH, J. Appellant, Joe Sullivan, and one Emory Connell were indicted by the grand jury of Pulaski County on July 3, 1923, for killing L. C. Hays, and also for killing George Moore, both of whom were killed at the same time and place. The case in which the killing of Moore was alleged was set for trial on July 30, 1923, at which time a special venire of a hundred men was ordered. The case was reset for August 1, but was then reset for August 20, and the special veniremen, being in court, were ordered to report again for duty on September 17, at which time the State elected to go to trial on the indictment charging the killing of Hay. Thereupon the defendants announced ready for trial, but first moved to quash the special venire on the ground that it had been summoned without authority, and that the act of the court in ordering the special venire to report at the times reset for the trial was unauthorized and prejudicial. It is insisted that, on account of the facts hereinafter recited, the special veniremen had imbibed the general prejudice which existed against the defendants, or had at least been subjected to influences which were hostile to them.

The various continuances were either asked by the defendants or consented to by them, and no objection was made to the summoning of the special veniremen, or to the act of the court in ordering the return, until the case was called for trial on the day the actual trial began, at which time the motion aforesaid was filed.

During the adjournment stated, which covered a portion of what would ordinarily have been a part of the summer vacation, the court had, for causes not shown, excused a number of the members of the regular panel, so that, when the case was called for trial, only fifteen members of the regular panel of the petit jury responded to the call of their names. Thereupon the court ordered the sheriff to summon jurors to become members of the regular panel, and a sufficient number of persons were called from the special venire and qualified for that purpose so that when the drawing of the jury began, which

the defendant demanded, there were twenty-four jurors in the box. An exception was saved to the action of the court in thus filling the jury.

We think no error was committed in the respects stated. These were matters over which the circuit judge must necessarily have a wide discretion. It is thoroughly settled that a defendant has no right to the services of any particular juror. He may only demand that he be tried before a fair and impartial jury, and it is difficult to imagine a case where the judge had excused a juror from further service on the regular panel which would afford any defendant just cause of complaint.

In the matter of summoning the special veniremen the trial judge is also necessarily vested with a wide discretion. He is charged with the duty of dispatching the business on his dockets, and should, of course, do so in a way to avoid either unnecessary delay or unnecessary expenses. Many cases recognize the right of the trial judge to order special jurors to be summoned before the actual trial begins, that they may be available without involving the delay of waiting for this to be done after the trial has begun. The necessity for the action here taken is shown by the fact that the jury was not completed until both the regular panel and the special venire had been exhausted, and opportunity was, no doubt, afforded by the examination of each venireman on his *voir dire* to ascertain whether, on account of the continuances, or for other reasons, he was not qualified to serve at the trial, and there is no assignment of error that the defendants were compelled to accept any juror who was in fact disqualified for any reason.

It was the theory of the State that the defendants were professional criminals, who, because of their crimes, were apprehensive of arrest at any time. That Connell had only recently killed a man in Sapulpa, Oklahoma, and that he and Sullivan had, on the night before they killed Hays and Moore, committed three separate burglaries, in one of which they had stolen a Ford touring car, in another they had stolen a Ford coupe, and in

a third had broken into a private home, where they had stolen some lace dresses and other wearing apparel and various articles of jewelry and silverware, which, the owner testified, were worth, or had cost, about two thousand dollars. That defendants knew these crimes would be investigated and an effort made to arrest the culprits who had committed them, and that they had prepared to resist any effort to effect their arrest, and, as a means to this end, they were armed with a .45 caliber pistol and two automatic .32 caliber pistols, and that, as soon as they were advised that Hay and Moore were officers, they commenced firing, to prevent the arrest which they supposed the officers had come to make. According to the State's theory, defendants thought the officers were about to arrest them, and they killed the officers to prevent this being done. Many witnesses gave testimony tending to support this theory of the case.

According to defendants, they were tourists who had been taking the baths at Hot Springs. Upon being advised by one McDonald that he had two cars to sell, they went to Pine Bluff, where the cars were, and, about midnight, after their arrival in Pine Bluff, they purchased the cars from McDonald and paid him for them, and then proceeded in the cars thus purchased to Little Rock, on their way back to Hot Springs. The presence of the articles stolen from the residence in one of the cars was admitted by the defendants, but was explained as having been inadvertently left in the car by McDonald, to whom they intended to return the package, which had been examined by them only casually, when they next saw him. That, upon their arrival in Little Rock, they sought to raise money on a diamond ring, for which Connell had paid between seven and eight hundred dollars in New Orleans, and, for this purpose, telephoned a negro man named Waddell, and made an appointment to meet Waddell at his house. The conversation in which the appointment was made occurred over the telephone, and Waddell inquired who they were, but, without revealing their identity, he was told that he

would know them when he saw them, and so he did when they came to his house, about seven o'clock in the morning. Waddell was still in bed when they arrived, and they asked an advance on the ring, which Waddell did not make, but their suspicions were aroused by Waddell's conduct, and they began to suspect that he was delaying them for some purpose, and about that time a white man in citizen's clothes came to the house and looked in the window and said, "Hello, Rube!" (that being Waddell's given name), and, without knocking, this man and another white man, who was also dressed in citizen's clothes, entered the house, without invitation so to do. Thereafter, without disclosing that he was an officer, Hay walked over to Connell and took hold of his hand, whereupon Connell freed himself from the man, whom Connell regarded as his assailant, and sprang to the bed, about which time the shooting commenced, the first shot fired striking Connell in the leg, after which Connell commenced firing, and continued to do so until he had emptied his pistol, after which he ran from the room, Sullivan having preceded him, without firing a shot, by jumping through a window when the first shot was fired. The defendants testified that Connell fired only after he had been shot, and that he did so to protect himself from what he regarded as a murderous assault.

Upon the issues thus joined we think no error was committed in permitting testimony showing that the defendants committed the burglaries, nor that Connell had killed a man in Oklahoma, for the reason hereinafter stated, and that they were fugitives from justice. This testimony tended to prove motive, and had probative value in determining the issues of fact as to the circumstances of the killing. The court, in several instructions, told the jury that this testimony was admissible for the purpose only of showing motive for the killing, and we think it was admissible for that purpose. The brief of the Attorney General cites a number of cases decided by this as well as by other courts, holding such testimony admissible for the purpose of showing motive.

When the testimony of the chief of police of Sapulpa, Oklahoma, was offered, showing that Connell had killed a man in that city and had fled, counsel for Connell objected, and, on his objection being overruled, asked the suspension of the trial for sixty days in order that he might take testimony to establish an alibi, as Connell claimed to have been in Kansas City, Missouri, at the time that killing occurred. This request was not granted, and, on behalf of the State, it is insisted that the motion was taken under advisement by the court and was not again called up, and no formal ruling thereon was made or requested.

We consider it unimportant whether the record sustains this contention or not, for the following reasons: The trial resulted in a verdict of guilty of murder in the first degree, and both defendants were sentenced to death. They prayed and perfected an appeal, pending which Connell escaped, and was killed in the effort to recapture him. His appeal was therefore dismissed, and only the appeal of Sullivan is now pending. But the court told the jury, in one of the instructions given, that the killing of the officers could not be considered against Sullivan for any purpose, and this instruction removed the prejudice, if any, in the admission of this testimony and in refusing to suspend the trial to enable Connell to offer testimony in support of an alibi.

There was offered in evidence what purported to be a dying declaration made by Hay, and this testimony was objected to upon the ground that the affirmative showing was not made that Hay had despaired of recovery at the time he made the statement offered in evidence. A number of witnesses testified on this question, and there are several contradictions of a minor nature in regard thereto. We set out only a summary of this testimony, from which it will appear that the court properly submitted the question to the jury whether a dying declaration had in fact been made.

The court set out fully in the instructions, to which no objection is urged, the conditions under which a dying

declaration may be offered in evidence, and the jury was told that, if these conditions had not been established, the statement of Hay was only hearsay testimony, and should not be considered for any purpose. Other instructions, to which no objections are urged, told the jury how to weigh this testimony, if they found it admissible. This was the proper practice, and accords with the decision of this court in the recent case of *Alford* v. *State,* 161 Ark. 256. See also *Freels* v. *State,* 130 Ark. 189.

The testimony on the part of the State showed that Hay said to the other officers who hurried to the scene of the shooting, that they (the defendants) had killed Moore and had got him, too. He said, at another time, that he had been shot to pieces, and knew he was done for. After he had been carried to the hospital he stated that he knew he was slipping. The prosecuting attorney and his stenographer called at Hay's room, and the prosecuting attorney told him he wanted to take his statement, and asked Hay if he knew the purpose of his visit. Hay stated that he realized his condition fully, and then made a statement, which the stenographer undertook to reduce to writing in shorthand.

On the part of the defendants, testimony was offered that Hay's nurse, his pastor and his surgeon encouraged Hay and made statements calculated to sustain and inspire him and to induce the belief on his part that he would recover. But it is not shown that he made any statements about the killing after these conversations occurred. The nurse testified that she told Hay, just as he was placed on the operating table, that they were not going to let him die, and the surgeon stated that neither the wounds nor the operation which the wounds made necessary would ordinarily have produced death, and that he did not expect Hay to die from either, but that Hay did die from an embolism, this being defined as a blood clot, traveling through the circulation, reaching a vessel which was not sufficient to carry it off.

Under this testimony and the instructions relating to it the jury might have found that Hay had not despaired of hope of recovery; but we do not think this finding was the only one warranted by the testimony. There was a question for the jury, and the testimony was submitted to the jury under proper instructions.

Over the objection of the defendant, the surgeon who performed the autopsy over Moore's body was permitted to describe the wounds which he found. This testimony was objected to as incompetent, for the reason that the defendants were not on trial for that killing. We think the testimony was admissible on the following theory. The shooting occurred in a small room, and there is a conflict in the testimony as to Sullivan's participation therein. Both he and Connell testified that Sullivan had no part therein, and that, as soon as the firing commenced, Sullivan jumped through a window, and saw only the first shot fired, and that it was fired by Hay, and wounded Connell. There is some conflict as to the location of the participants. It is the theory of the State that Hay and Connell were at all times facing each other, and that Hay was struggling to keep Connell from shooting him, as is evidenced by the fact that Hay was shot in both legs, the shot in the right leg being between the ankle and the knee, and that Hay at no time faced Sullivan, yet he was shot in the left buttock. It is the theory of the prosecution that this wound was inflicted by Sullivan, and that, from his position, Sullivan must also have shot Moore, it being insisted that the location of Moore's wounds gave support to that theory. Moore was killed before he could draw his pistol, and, upon examination of his pistol, it was found that he had never fired it. Hay stated, in the alleged dying declaration, that he himself only commenced firing after he had been shot down, and that he fired three shots at Connell, one of which, he thought, had taken effect, and so it had, as Connell's leg was shattered to such an extent that amputation later proved necessary, and it was on account

of Connell's condition, thus caused, that the various postponements of the trial occurred.

The court gave full, fair and correct instructions, which submitted the issues of fact to the jury. Forty-two instructions were given, and the jury was told in several instructions, predicated upon the theory of the defense, to acquit the defendants if the facts were as contended by them, or if a reasonable doubt was entertained as to their guilt.

The court gave a number of instructions requested by the defendants, but refused to give instructions numbered 1, 2, 3, 4 and 5, and exceptions were duly saved to this refusal.

Instruction numbered 1 dealt with testimony in regard to the other crimes with the commission of which the defendants were accused, and, if given, they would have directed the jury that, in "arriving at a verdict in this case, you are in no wise to consider the guilt or innocence of either of these defendants with reference to any other alleged offense." This was properly refused, for the reason we have stated, that the testimony sought to be excluded tended to show motive for the killing and to explain the conduct of the parties thereto.

Instruction numbered 2 told the jury not to consider any evidence as to the killing of a man in Oklahoma; but, as we have said, this testimony was expressly confined by another instruction to Connell, and his appeal is not now pending.

Instruction numbered 3 would have instructed the jury not to consider any evidence as to the stealing of the cars as in any way tending to prove the guilt of either of the defendants. What we have said about instruction numbered 1 disposes of this objection.

Instruction numbered 4 stated hypothetically the salient features of the defense, and told the jury that, if the officers did not disclose their identity as such, and were apparently committing, or about to commit, an assault on the defendants, who believed themselves to be in danger of being killed or of receiving great bodily

harm, and that, acting under this belief, Hay was killed, to find the defendants not guilty. This instruction was given as instruction 38-A. Moreover, the proposition there announced was fully covered in several other instructions which were also given.

Instruction numbered 5 would have told the jury, if given, that, if the defendant Sullivan "did not do any of the shooting, or if you have a reasonable doubt as to whether he did any of the shooting, then in either event you must find Sullivan not guilty."

This instruction was properly refused, for two reasons. In the first place, the State is not required to prove each circumstance tending to show guilt beyond a reasonable doubt. The evidence is legally sufficient for that purpose if, upon a consideration of the testimony as a whole, it is sufficient to convince, and does convince, the jury beyond a reasonable doubt of the guilt of the accused. *Lasater* v. *State,* 77 Ark. 468; *Starnes* v. *State,* 128 Ark. 302.

The second reason is that Sullivan might have been guilty, even though he had not fired a shot, and he was guilty if he stood by and aided or abetted Connell to do so. Notwithstanding this fact, the instruction, if given, would have told the jury to acquit the defendant Sullivan if he fired none of the shots.

Moreover, in instruction numbered 29, the jury was told that they could not convict the defendant, Joe Sullivan, on the indictment against him, of any offense unless it was found from the evidence, beyond a reasonable doubt, that he fired one or more shots at L. C. Hay, or that he stood by aiding, abetting or assisting the defendant Connell in the shooting of Hay.

The defendant asked an instruction reading as follows: "You are instructed that, before you can convict the defendants, or either of them, of murder in the first degree (that it is indispensable) that the proof adduced *shall* be sufficient to satisfy the minds of the jury, beyond a reasonable doubt, that the actual death of L. C. Hay was the ultimate result sought by the con-

curring will, deliberation, malice and premeditation of the defendants, or either of them. The material inquiry, then, for the jury is, was the killing of L. C. Hay wilful, deliberate, malicious and determined on or before the act of killing? If it was not, then you cannot convict of murder in the first degree.''

This instruction was given after it had been modified by striking out the phrase, ''that it is indispensable,'' inclosed in the parentheses, and by striking out the word ''shall,'' italicized in the instruction as set out above, and inserting in lieu thereof the word ''must.''

This instruction was based on the discussion of the court in the case of *Bivens* v. *State*, 11 Ark. 455, which was quoted with approval in the case of *Harris* v. *State*, 119 Ark. 85. It appears, however, that this language, substantially taken from those opinions, was followed by another paragraph, containing qualifications not incorporated in the instruction, to the effect that the intent to kill might be formed in an instant, and that there was premeditation if such intent existed at the time the killing occurred.

The words inclosed in the parentheses are mere words of emphasis, but, as given, the instruction required that the minds of the jury be satisfied, beyond a reasonable doubt, that there was deliberation, malice and premeditation, before a verdict of guilty of murder in the first degree could be returned. The instruction as modified is sufficiently emphatic and is a correct declaration of the law.

What we have just said disposes, in principle, of defendant's instruction numbered 12, which was given as requested, except that the word ''must,'' appearing in two places, was stricken out and the word ''may'' inserted. This instruction, as well as several others which were also given, dealt with the right of the defendants to resist what they may have regarded as an assault being made upon them by private citizens. These facts were by no means undisputed, indeed, they are of the essence of this case, and they were not entitled to any considera-

tion if the jury did not find that the theory of the defense was true.    It is not the province of the court to emphasize the value or relative bearing of any testimony, as this is the peculiar province of the jury, and the jury was clearly told to base their finding upon all of the testimony which they credited and believed.

It is finally insisted that the testimony is not legally sufficient to support the conviction of Sullivan.    We think the contrary appears from what we have said. Sullivan testified that he not only fired none of the shots, but that he was unarmed, and that his pistol had been left in a car, which they had driven into the woods several miles from Little Rock, on their way to that city. On the other hand, there is testimony placing the number of shots fired as high as fifteen.    Moore did no shooting, Hay only fired three shots, and Connell only emptied one pistol, which he said held ten cartridges.    Moreover, witnesses for the State, who saw defendants leave the house where the shooting occurred, described them as a large man, who proved to be Sullivan, and a small man, who proved to be Connell, and that the large man had a pistol in each hand as he made his way to the car. One witness testified that he saw the large man with two pistols, and that he thought the large man had arrested the small man and was carrying him to the car.

After leaving Little Rock in the coupe, the defendants abandoned it when they came to where the touring car was.    This was done because of Connell's suffering, which by that time had become very acute.    The agony increased, and he could proceed no further, so he climbed out of the car and hid in the woods while Sullivan went in search of a surgeon. On his way to Sheridan, looking for a surgeon, Sullivan was arrested by the sheriff of Grant County and his posse, who had been notified of the shooting of the officers.    Sullivan at first denied his identity, but, when the car in which he was driving was identified as one of the stolen cars, he admitted that he was one of the men for whom the officers were searching.    The sheriff testified that he

asked Sullivan if he took part in killing those men, and Sullivan answered, "Yes, the whole damned thing was uncalled-for." This statement was explained in part and denied in .part by Sullivan, but its truth, of course, was for the jury.

Certain other questions are discussed in the brief for appellant, but we think they have been disposed of by what we have already said.

Finding no error, the judgment is affirmed.